**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| CITIMORTGAGE, INC., | ) |
| | ) |
|         Plaintiff, | ) |
| | ) |
| v. | )   No. 4:09-CV-2104-FRB |
| | ) |
| NL, INC., et al., | ) |
| | ) |
|         Defendants. | ) |

**MEMORANDUM IN SUPPORT OF DEFEDANT RPM MORTGAGE'S**
**MOTION TO DISMISS, OR, IN THE ALTERNATIVE,**
**<u>FOR A MORE DEFINITE STATEMENT</u>**

**I.   FACTUAL AND PROCEDURAL BACKGROUND.**

On December 23, 2009, Plaintiff CitiMortgage, Inc. (hereinafter "Plaintiff" or "CMI") filed its Complaint in this matter, naming as defendants NL, INC., f/k/a Najarian Loans, Inc., (hereinafter "NL") and RPM Mortgage, Inc., (hereinafter "RPM").  In its Complaint, Plaintiff alleges that NL and RPM sold residential mortgage loans to it pursuant to separate correspondent agreements.  This action arises out of claimed breaches by NL of its correspondent agreement with Plaintiff.  The Complaint contains two Counts, one for breach of contract against NL and one for the alter ego liability of RPM for NL's alleged breaches.

For the reasons given below, Plaintiff's Complaint does not state a claim for which relief can be granted against RPM and, therefore, RPM is entitled to an order of dismissal under FED. R. CIV. P. 12(b)(6) of Count II of Plaintiff's Complaint as it applies to RPM.  The scant allegations of ties between NL and RPM do not plausibly show complete control of NL by RPM leading to a wrong that proximately caused the injury alleged by Plaintiff.  In the alternative, as Plaintiff's Complaint is so vague and ambiguous concerning the bases for RPM's alleged alter ego liability, RPM moves for an order requiring a more definite statement, pursuant to FED. R. CIV. P. 12(e), such that RPM might be able to prepare a response thereto.

**II.     PLAINTIFF'S COMPLAINT DOES NOT STATE A CLAIM UNDER THE ALTER EGO DOCTRINE FOR WHICH RELIEF MAY BE GRANTED AGAINST RPM AND SHOULD BE DISMISSED OR, IN THE ALTERNATIVE, THE COURT SHOULD REQUIRE A MORE DEFINITE STATEMENT.**

    **A.     The Standard For Relief Under Rule 12(b)(6) and Rule 8(a) Requires Plaintiff To Show That It Is Entitled To Relief.**

The Federal Rules of Civil Procedure require a plaintiff to make "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). The requirement of "showing that the pleader is entitled to relief" is enforced under FED. R. CIV. P. 12(b)(6) which provides that a claim may be dismissed because it fails to allege sufficient facts to support an otherwise cognizable legal claim. *See Braden v. Wal-Mart Stores, Inc.*, 588 F. 3d 585, 594 (8th Cir. 2009) ("In order to … survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. … The plausibility standard requires a plaintiff to show at the pleading stage that success on the merits is more than a sheer possibility.") (internal quotes and citations omitted).

As this court has explained the standard, to survive a motion to dismiss under Rule 12(b)(6), the factual allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Grobe v. Vantage Credit Union*, 2010 WL 198462 (E.D. Mo. 2010) (citing *Bell Atl. v. Twombly*, 550 U.S. 544, 555 (2007)). *See also Little Rock Cardiology Clinic PA v. Baptist Health*, 591 F.3d 591, 596 (8th Cir. 2009) (stating that the standard requires the court "to determine whether the complaint asserts facts that affirmatively and plausibly suggest that the pleader has the right he claims ... rather than facts that are merely consistent with such a right.") (internal quotes and citation omitted); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (a pleading must contain "enough facts to state a claim to relief that is plausible on its face.").

Here, Plaintiff seeks to pierce the "corporate veil" and establish that RPM is somehow liable for the alleged breaches of NL, which is to say that it seeks to show that NL is merely the

alter ego of RPM with respect to alleged breach(es) of NL. However, none of the factual claims offered by Plaintiff in support of its attempt to plead alter ego liability, nor any combination of them, even when all are assumed to be true, rise to the level of proof required to establish such an alter ego relationship under the applicable precedents.

1.  **Plaintiff's Allegations and Offered Facts Do Not Meet The Required Showing That Plaintiff Is Entitled To Relief.**

Plaintiff attaches to its Complaint the Correspondent Agreement between Plaintiff and NL (hereinafter, the "NL Agreement") under which Plaintiff alleges the breaches by NL. The NL Agreement contains a provision entitled "GOVERNING LAW; VENUE" that specifies, "This Agreement shall be governed by the laws of the state of Missouri and applicable federal law." Complaint ¶ 33 at 6; Correspondent Agreement at 6. Plaintiff alleges that NL breached the NL Agreement in that NL allegedly "delivered loans that failed to adhere to the terms of the NL Agreement and subsequently refused to cure those nonconforming loans or repurchase those loans," Complaint ¶ 47 at 9, and alleges that it has been "damaged in excess of $1,200,000.00…." Complaint ¶ 55 at 10.

Count II of the Complaint states, "[t]he interrelationship between NL and RPM was effectively manipulated so that NL could avoid its liability to CMI and its other creditors," Complaint ¶ 59 at 10, "RPM is the alter ego of NL and is responsible for its debts," Complaint ¶ 59 at 10, and, "[e]quity demands that RPM be held liable for NL's breach of the NL Agreement because of this manipulation of the interrelationship between the two companies to evade NL's creditors, including CMI," Complaint, ¶ 61 at 11.

In support of Count II, naming RPM, Plaintiff alleges the following facts (Complaint ¶¶ 21-32 at 5-6):

- The CEO of both NL and RPM is Robert Hirt.

- The President of both NL and RPM is Tracey Hirt.

- Robert and Tracey Hirt own 100% of the shares of both NL and RPM.

- "Robert and Tracey Hirt effectively had and exercised total domination and

3

- control over the operations of both NL and RPM."
- RPM was incorporated on or about June 19, 2007, and began doing business on or about August 15, 2007.
- RPM was a wholly-owned subsidiary of NL until August 1, 2008, at which time NL sold 100% of RPM's shares to private investors.
- During most of 2008, NL and RPM formed a "co-borrower relationship" on the warehouse lines of credit that NL and RPM used to finance the issuance of residential mortgage loans, but by December 31, 2008, RPM became the sole party on one of these warehouse line of credit.
- "RPM sought approval from CMI to sell residential mortgage loans to CMI and asked for 'expedited approval' due to the fact that it was the same company as NL."
- "When asked about the company change, RPM claimed that NL was a '1099 employer' and that it needed to convert to a 'W-2 employer' to originate FHA loans."
- "During this approval process, RPM also stated that it needed to 'recapitalize.'"
- RPM signed the Correspondent Agreement between Plaintiff and RPM on February 2, 2009.
- "In 2009, when NL refused to repurchase the defective loans at issue in this case, representatives of NL and RPM told CMI that NL was 'effectively insolvent.'"

For the reasons given below, none of these facts nor any combination of them rises to the level necessary to make even a colorable argument in favor of finding alter ego liability in RPM for the alleged acts of NL, and, for that reason, RPM's 12(b)(6) Motion should be granted and Plaintiff's Count II for alter ego liability in RPM should be dismissed.

> 2. **The Standard For Finding Alter Ego Liability Under Missouri Law Requires A Greater Showing Of Factual Support Than Plaintiff Has Provided In Its Complaint.**

Missouri law presumes the independent existence of a corporation. *See Greater Kansas City Laborers Pension Fund v. Superior General*, 104 F.3d 1050, 1055 (8th Cir. 1997) (noting "the long-established principle that a corporation's existence is presumed to be separate and may be disregarded only under narrowly prescribed circumstances."). While the burden of overcoming this presumption via the alter ego doctrine has been described by the courts with slightly different language from one case to the next, there is a consistent standard running through those opinions. Specifically, it has been held that the "corporate veil" may be pierced when it is found that the alleged alter ego entity "is controlled by another to the extent that *it has independent existence in form only*…. Thus, *control by one company over its alleged alter ego is necessary* under the corporate law standard." *Id.* (emphasis added). This court has explained the standard as follows: "[T]he Eighth Circuit has held that the alter-ego test can be a flexible one. … If one general principle can be gleaned from these cases, however, it is that *an alter ego or agency relationship is typified by parental control of the subsidiary's internal affairs or daily operations*." *In re Genetically Modified Rice Litigation*, 576 F.Supp.2d 1063 (E.D. Mo. 2008) (emphasis added; internal quotes and citations omitted). Put yet another way, it has been held under Missouri law that:

> [i]n order to "pierce the corporate veil," the plaintiff must first show control – not mere majority or stock control, but complete domination, not only of finances, but of policy and business practice with respect to the transaction, such that the corporate entity had no separate mind, will or existence of its own.

*Mobius Management Systems, Inc. v. West Physician Search*, 175 S.W.3d 186, 188 (Mo. Ct. App. 2005). None of the facts alleged by Plaintiff here, whether individually or combined, rises to this standard and, ergo, cannot overcome the presumption of independent corporate existence.

This court has previously entertained 12(b)(6) motions in the context of alter ego arguments. In *Osgood v. Midwest Parking Solutions*, Slip Copy, 2009 WL 4825192 (E.D. Mo. 2009), this court held that the plaintiff's allegations were sufficient to survive the motion to dismiss because the defendant "co-mingled his personal assets with corporate assets, disregarded corporate formalities, and permitted [the corporation] to operate in an under-capitalized condition." 2009 WL 4825192 at *2.

In *Gannon Joint Venture Ltd. Partnership v. Masonite Corp.*, 2008 WL 2074110 (E.D. Mo. 2008), this court expressed the alter ego standard as requiring plaintiffs to establish, as follows:

> (1) Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and (2) such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or dishonest and unjust act in contravention of plaintiff's legal rights; and (3) *The aforesaid control* and breach of duty *must proximately cause the injury or unjust loss* complained of.

2008 WL 2074110 at *3-4 (emphasis added). The aspect of the control by one party of its alleged alter ego is lacking in Plaintiff's Complaint here, and particularly so with respect to the element of such control proximately causing the alleged loss.

### 3. Plaintiff's Alleged Facts Cannot Support A Finding That NL Was The Alter Ego of RPM.

The contract of which Plaintiff alleges a breach in this matter is one executed by NL, not by RPM. Complaint ¶ 19 at 5. Plaintiff alleges that NL was the alter ego of RPM, which allegation is in turn based on the above-listed twelve (12) alleged facts. However, an examination of those facts and relevant precedent under Missouri law confirms that Plaintiff's alleged facts cannot support a finding of such an alter ego relationship.

Plaintiff first offers as support for its alter ego theory allegations that: (1) the CEO of both NL and RPM is Robert Hirt; (2) the President of both NL and RPM is Tracey Hirt; and (3) Robert and Tracey Hirt own 100% of the shares of both NL and RPM.  Complaint ¶ 21-23 at 5.  None of these facts go to show anything about how RPM might have influenced the operations of NL, much less show that RPM had complete domination of policy and business practices with respect to NL's dealings with Plaintiff.  Indeed, were a claim made about the *individuals* cited in these facts and their relationship with NL, the purported alter ego entity, then these asserted facts might conceivably have some relevance to a claim against those individuals, as meager as that relevance might be.  However, no such claim has been made.  There is nothing in these three facts to support Plaintiff's claim that any acts by the named individuals cited did anything to exert "complete domination" over NL on behalf of RPM, as Plaintiff is legally required to show.  The alleged facts, if assumed to be true, merely show that the two companies shared officers and shareholders, a common situation and one not tending to show any influence, undue or otherwise.

Plaintiff next offers as support for its alter ego theory the statement that (4) "Robert and Tracey Hirt effectively had and exercised total domination and control over the operations of both NL and RPM."  Complaint ¶ 24 at 5.  This statement is a legal conclusion apparently offered to argue Plaintiff's case.  It says nothing about any specific act of or failure to act by any individual or any entity.  It is not something the accuracy of which can be weighed by the court or a jury in its role as a finder of fact and, therefore, it is not evidence which has any relevance to Plaintiff's claim.  *See Maganallez v. Hilltop Lending Corp.,* 505 F.Supp.2d 594, 607 (N.D. Cal. 2007) ("[c]onclusory allegations of alter ego status will not survive a motion to dismiss."). In short, it has no relevance whatsoever to this Motion, except to further indicate that the facts offered by Plaintiff cannot support its alter ego argument.

Plaintiff then offers as support for its alter ego theory the statement that (5) RPM was incorporated on or about June 19, 2007, and began doing business on or about August 15, 2007. Complaint ¶ 25 at 5. It is unclear why Plaintiff includes this statement, but in any event it says

7

nothing about any act of or failure to act by any individual or any entity that is relevant to Plaintiff's claim or its alter ego theory. In no way can it go to show anything about how RPM allegedly exercised any influence over NL, much less the "complete domination" over NL that Plaintiff must show.

Plaintiff further offers as support for its alter ego theory the statement that (6) RPM was a wholly-owned subsidiary of NL until August 1, 2008, at which time NL sold 100% of RPM's shares to private investors. Complaint ¶ 26 at 5. Again, it is unclear why Plaintiff includes this statement. If anything, this fact, if true, might go to show that RPM was an alter ego of NL, and that NL controlled RPM, not the other way around as Plaintiff alleges. In any event, it provides no support for Plaintiff's claim that NL was the alter ego of RPM and that RPM completely dominated NL, which Plaintiff must again show in order to find liability in RPM for the acts of NL.

Plaintiff also offers as support for its alter ego theory the statement that (7) "During most of 2008, NL and RPM formed a 'co-borrower relationship' on the warehouse lines of credit that NL and RPM used to finance the issuance of residential mortgage loans, but by December 31, 2008, RPM became the sole party on one of these warehouse line of credit." Complaint ¶ 27 at 5-6. This statement is opaque as to its relationship to Plaintiff's claim. The meaning of the quoted term "co-borrower relationship" is not explained, much less defined in any way that reveals its significance. There is no indication that anything this statement might mean or imply has any relationship to Plaintiff's burden to show that RPM dominated or even influenced NL's behavior in any way relevant to Plaintiff's claim. This alleged fact might imply that the two companies cooperated in some way that was beneficial to them both. In no way does it show any control of RPM over NL, much less the complete domination of NL by RPM that Plaintiff asserts.

Plaintiff next offers as support for its alter ego theory the statement that (8) "RPM sought approval from CMI to sell residential mortgage loans to CMI and asked for 'expedited approval' due to the fact that it was the same company as NL." Complaint ¶ 28 at 6. Again, Plaintiff poses

a legal conclusion — that RPM "was the same company as NL" — as if it were a fact that supports its argument.  And again, Plaintiff uses a quoted term, here "expedited approval," as if it has some significance, but we are left to wonder what that significance might be.  There is no suggestion that this was a term that some relevant person used or that it appeared in a relevant document.  More importantly, there is no reason to believe that RPM's asking for "expedited approval," another phrase from some unspecified context with an unexplained meaning, to sell loans to Plaintiff could in any way show that RPM exercised complete dominance over NL.

        Plaintiff then offers as support for its alter ego theory the statement that (9) "When asked about the company change, RPM claimed that NL was a '1099 employer' and that it needed to convert to a 'W-2 employer' to originate FHA loans."  Complaint ¶ 29 at 6.  Plaintiff does not explain what "the company change" means, nor can one glean the significance to Plaintiff's claim of what kind of "employer" RPM might have been at any particular time or what employee(s) might be relevant to this statement, given the lack of context Plaintiff offers.  Regardless, there is nothing in this statement indicating that RPM had any influence over NL.

        Plaintiff next offers as support for its alter ego theory the statement that (10) "During this approval process, RPM also stated that it needed to 'recapitalize.'"  Presumably Plaintiff's reference to "this approval process" relates to the request for "expedited approval" listed earlier in Plaintiff's Complaint, though that is not entirely clear.  Regardless, the use of "recapitalize" in quotes implies the word has some unusual meaning, or a meaning that requires some explanation or definition, but Plaintiff supplies none.  Construing this allegation in a light most favorable to Plaintiff, however, it still provides no support for Plaintiff's alter ego argument.  If Plaintiff had alleged that **NL** was undercapitalized, it could conceivably lend some support for the theory that NL was an alter ego of someone else, but that is not what Plaintiff alleged.  Even if RPM were undercapitalized at some time relevant to Plaintiff's Complaint, it would do nothing to show that RPM dominated the business of NL.  If anything, it would tend to show just the opposite — that RPM was not unable to dominate anything, much less another company through which it allegedly carried out some unlawful act.

9

Plaintiff then offers as support for its alter ego theory the statement that (11) RPM signed the Correspondent Agreement between Plaintiff and RPM on February 2, 2009. Again, it is unclear why this fact is included in Plaintiff's Complaint or how it could be construed to lend any support to the notion that RPM controlled NL in any way.

Plaintiff finally offers as support for its alter ego theory the statement that (12) "In 2009, when NL refused to repurchase the defective loans at issue in this case, representatives of NL and RPM told CMI that NL was 'effectively insolvent.'" Even if true, this fact says nothing about RPM's alleged control of NL. If NL was indeed facing financial difficulties in 2009, that fact is not relevant to whether NL was adequately capitalized earlier in its corporate history, which is the relevant time in regard to a claim of undercapitalization. *See, e.g., Real Estate Investors Four, Inc. v. American Design Group Inc.*, 46 S.W.3d 51, 57-58 (Mo. Ct. App. 2001) ("[w]hether a corporation's capitalization is adequate depends on the business of the particular corporation and *is generally measured at the time of incorporation*.") (citing *66, Inc. v. Crestwood Commons Redevelopment Corp.*, 998 S.W.2d 32, 41 (Mo. banc 1999); emphasis added). Plaintiff may list a statement about "effective insolvency" to support some other part of its Complaint as opposed to its alter ego argument. In any event, Plaintiff's statement about NL's effective insolvency in 2009 provides no support for the allegation that NL was the alter ego of RPM.

None of the facts offered by Plaintiff in its Complaint are sufficient to establish alter ego liability in RPM for the alleged breach(es) of NL. Discarding the legal conclusions in Plaintiff's Complaint, which are irrelevant to this Motion, the actual facts alleged are insufficient. Plaintiff alleges no mixing of finances, undercapitalization, or failure to observe corporate formalities, as were found in *Osgood*, above. 2009 WL 4825192 (E.D. Mo. 2009). Plaintiff alleges no day-to-day control by RPM of NL's business activities. Certainly Plaintiff alleges no facts constituting "complete domination … of policy and business practice with respect to the transaction, such that the corporate entity had no separate mind, will or existence of its own." *Mobius Management Systems, Inc. v. West Physician Search*, 175 S.W.3d 186, 188 (Mo. Ct. App. 2005).

Plaintiff offers no facts tending to show that RPM's "control and breach of duty … proximately cause[d] the injury or unjust loss complained of." *Gannon Joint Venture Ltd. Partnership v. Masonite Corp.*, 2008 WL 2074110 (E.D. Mo. 2008).

Thus, no fact or combination of facts that Plaintiff alleges, including those regarding who the officers of the two companies were when the companies came into existence (or are at present), that the companies shared officers or shareholders, or even that the companies may have cooperated in some way relative to running their separate businesses, go to show that one company dominated the other. Plaintiff's Complaint offers no facts supporting the allegation that NL was the alter ego of RPM in any way that enabled RPM to proximately cause any harm to Plaintiff via the alleged breach of contract by NL, as Plaintiff must show to find alter ego liability in RPM. For that reason, Plaintiff's Complaint should be dismissed as against RPM for failure to state a claim for which relief can be granted.

      **B.**     **The Court Should Order A More Definite Statement Of Plaintiff's Claim Against RPM.**

Should the court not grant RPM's Motion to Dismiss under FED. R. CIV. P. 12(b)(6), RPM is nonetheless entitled, for the reasons stated below, to a more definite statement of Plaintiff's claim against it. Rule 12(e) of the Federal Rules of Civil Procedure provides that "[i]f a pleading to which a responsive pleading is permitted is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading, the party may move for a more definite statement before interposing a responsive pleading." Fed. R. Civ. P. 12(e).

RPM acknowledges that in light of the liberal notice pleading standard of Rule 8 of the Federal Rules of Civil Procedure and the discovery available to both sides, courts in this district apply a stringent standard to Rule 12(e) motions. *Nextep., LLC, v. KABA Benzing America, Inc.*, 2007 WL 4218977 at * 2 (E.D. Mo. Nov. 29, 2007). However, when a Rule 12(e) motion is not seeking to correct a claimed lack of detail, but rather is filed with the court to seek a remedy for unintelligible pleadings, the motion should be granted. *Id*. As noted by this court "[a] motion for more definite statement is proper when a party is unable to determine issues he must meet, or

where there is a major ambiguity or omission in the complaint that renders it unanswerable." *Leonard v. BASF Corp.*, 2006 WL 3702700 at *2 (E.D. Mo. December 13, 2006), citing *Tinder v. Lewis County Nursing Home Dist.*, 207 F.Supp.2d 951, 959 (E.D. Mo. 2001)  (internal citations omitted).

As discussed above, Plaintiff has attempted to allege only an alter ego theory against RPM.  However, nothing that Plaintiff has alleged actually shows the requisite degree of control of NL by RPM to support an alter ego claim.  Nothing pled by Plaintiff links RPM to the harm that is claimed to have resulted from NL's supposed breaches of its correspondent agreement with Plaintiff.  Plaintiff has provided only a barebones recitation of a few links that are alleged to exist (or existed in the past) between the two defendant companies.  In short, there is nothing in the Complaint that actually supports Plaintiff's alter ego claim, which necessarily raises the question as to what claim Plaintiff is actually trying to state against RPM, and upon what facts.  This uncertainty, born of the ambiguity of the allegations in the Complaint, places RPM in an impossible position in preparing a proper answer.

If, as asserted on the face of the Complaint, Plaintiff is attempting to state an alter ego claim against RPM, then it should be required to actually speak to the well-established elements of such a claim under Missouri law—if it can.  This includes the issues of absolute control and of proximate causation.  Since the few facts alleged do not support a claim of alter ego liability, RPM can only guess what act(s) on its part might contribute to Plaintiff's claim against it, and it can only guess as to the actual nature of Plaintiff's claim.  As a supposed alter ego claim, Count II of the Complaint is grossly incomplete and unintelligible.  If it decides not to dismiss the Complaint outright, the Court should, pursuant to Rule 12(e), order a more definite statement of the claim against RPM, requiring Plaintiff to include facts supporting each element of an alter ego claim under Missouri law.

**III. CONCLUSION.**

For all those reasons given above, this court should grant RPM's Motion to Dismiss for Plaintiff's failure to state a claim upon which relief can be granted. In the alternative, RPM's Motion For a More Definite Statement should be granted so RPM can know what claim Plaintiff is trying to assert and the proper factual basis of that claim. Without a more definite statement, RPM cannot properly respond to the allegations made against it in the Complaint.

Respectfully submitted,

**LEWIS, RICE & FINGERSH, L.C.**

By: /s/ Evan Z. Reid
Evan Z. Reid, Bar Number: #93822

600 Washington Ave., Ste. 2500
St. Louis, Missouri 63101
Telephone: (314) 444-7600
Facsimile: (314) 241-6056
ereid@lewisrice.com

Attorneys for RPM Mortgage, Inc.

## Certificate of Service

The undersigned hereby certifies that the foregoing was filed with the Clerk of Court for electronic service on all counsel of record via the CM/ECF system on March 19, 2010.

                                          /s/ Evan Z. Reid