**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CITIMORTGAGE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:09-cv-2104-FRB |
| | ) | |
| NL, INC. f/k/a NAJARIAN LOANS, INC., and | ) | |
| RPM MORTGAGE, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM IN OPPOSITION TO DEFENDANT RPM MORTGAGE'S MOTION**
**TO DISMISS, OR, IN THE ALTERNATIVE, FOR A MORE DEFINITE STATEMENT**

This breach of contract case has two defendants: NL, Inc. ("NL") and RPM Mortgage, Inc. ("RPM"). CitiMortgage, Inc. ("CMI") alleges that both NL and RPM are liable for breach of a correspondent agreement with CMI. NL has sold residential mortgage loans to CMI since 2000. In 2009, CMI demanded that NL repurchase several defective loans under the parties' agreement, and NL refused to do so. Yet, in early 2009, the principals of NL sought approval from CMI to sell loans to CMI under the name RPM Mortgage, Inc. ("RPM"). RPM told CMI that it was "the same company" as NL and this meant CMI should grant RPM "expedited approval" as a correspondent. Relying on this representation, CMI granted approval to RPM and RPM began selling loans to CMI under a contract identical to the one under which NL had sold loans to CMI. Only then did the principals of NL and RPM tell CMI that NL was insolvent and that it could not repurchase the defective loans. The unavoidable inference is that the principals of NL and RPM wanted to continue to profit from the sale of residential loans to CMI under the RPM name while at the same time escaping NL's liabilities.

RPM has moved to dismiss CMI's Complaint on the grounds that it does not provide enough specific facts as to the manner in which RPM defrauded CMI to state a claim for alter ego liability.  Aside from the fact that CMI's Complaint complies with Fed. R. Civ. P. 8 and applicable pleading standards, it would be a strange result indeed to require CMI to identify *more* facts concerning the manner in which it was defrauded by the manipulation of the interrelationship between NL and RPM.  In any event, CMI's Complaint more than adequately lays out a plain statement of its claims against RPM.  RPM's motion to dismiss should be denied.

## BACKGROUND

NL first entered into a correspondent relationship with CMI to sell residential mortgage loans (Compl. ¶ 2).[1]  Though the parties' relationship began in 2000, the operative agreement between NL and CMI that governs the sale of the six loans at issue in this case was dated September 28, 2005 (the "NL Agreement") (Compl. ¶ 2).  These six loans were defective under the NL Agreement (Compl. ¶ 4).  During 2009, CMI notified NL of the defects in these six loans and demanded that NL cure the defects or repurchase the loans as it was obligated to do under the NL Agreement (Compl. ¶¶ 48-53).  NL failed to cure the defects in these loans and refused to repurchase them even though it had a contractual duty to do so (Compl. ¶ 54).

The owners of NL incorporated RPM on or about June 19, 2007, and RPM began doing business on or about August 15, 2007 (Compl. ¶¶ 21-25).  For the first year of RPM's existence, it operated as a wholly-owned subsidiary of NL (Compl. ¶ 26).  On or about August 1, 2008, NL sold 100% of RPM's shares to private investors (id.).[2]  During 2008, both before and after the

---

[1] These facts are drawn from CMI's Complaint (ECF Doc. 1), and must be taken as true for purposes of this motion under Fed. R. Civ. P. 12(b)(6).  Little Rock Cardiology Clinic P.A. v. Baptist Health, 591 F.3d 591, 595-96 (8th Cir. 2009).

[2] In NL's Answer, these investors are identified as "a trust, the trustees of which were individuals" (NL Answer, ECF Doc. 19 at ¶ 11).

shares in RPM were sold, RPM and NL were "co-borrowers" on one of the warehouse lines of credit which NL and RPM used to originate residential mortgages (Compl. ¶ 27).

In late 2008 and early 2009, RPM asked CMI for approval to become a CMI correspondent, just like NL (Compl. ¶ 28). During CMI's due diligence for approval of a correspondent relationship with RPM, RPM indicated to CMI that it deserved "expedited approval" because RPM and NL were the same company (id.). RPM claimed that it was just changing names because NL was a "1099 employer" and RPM was going to be a "W-2 employer" (Compl. ¶ 29). CMI granted approval to RPM and RPM signed a correspondent agreement with CMI dated February 2, 2009 (the "RPM Agreement") (Compl. ¶ 31, Compl. Exh. 2). Robert Hirt, CEO of both NL and RPM, signed both the NL Agreement and the RPM Agreement (compare Compl. Exh. 1 with Compl. Exh. 2).

Robert and Tracey Hirt own 100% of the shares of both NL and RPM, and hold the same executive positions with each company (Compl. ¶¶ 21-23). As of early 2009, RPM held itself out as "the same company" as NL, and took over NL's warehouse line of credit for loan origination (see Compl. ¶ 27). RPM sought approval to sell loans to CMI under the RPM name, since it was "the same company" (see Compl. ¶¶ 28-29). When CMI asked NL to repurchase the defective loans it sold CMI, representatives of NL and RPM said that NL was effectively insolvent (Compl. ¶ 32).

**STANDARD OF REVIEW**

When deciding a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the district court is obligated to accept "the allegations contained in the complaint as true and draw[] all reasonable inferences in favor of the nonmoving party." Little Rock Cardiology Clinic P.A. v. Baptist Health, 591 F.3d 591, 595-96 (8th Cir. 2009). "A complaint must contain sufficient factual

matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Braden v. Wal-Mart Stores, Inc. 588 F.3d 585, 594 (8th Cir. 2009) (citing Ashcroft v. Iqbal, --- U.S. ----, 129 S.Ct. 1937, 1949 (2009) and Bell Atlantic v. Twombly, 550 U.S. 544, 570 (2007)).   "The plausibility standard requires a plaintiff to show at the pleading stage that success on the merits is more than a 'sheer possibility.'"   Braden, 588 F.3d at 594.   "It is not, however, a probability requirement."   Id.   Thus, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof on the facts alleged is improbable, and 'that a recovery is very remote and unlikely.'"   Id. (citing Twombly, 550 U.S. at 556).

## ARGUMENT

In effect, RPM's motion asks CMI to tell the Court more about how the principals of NL transformed their company into RPM in order to evade their obligations to CMI, so that RPM has further notice of how to defend this case.   The Complaint is clear.   The principals of NL closed down NL and opened RPM in the exact same line of business, originating residential mortgage loans, and selling those loans to investors such as CMI.   After a year of incubating RPM as a wholly-owned subsidiary, the principals of RPM came to CMI and asked for approval to sell loans to CMI under the RPM name and told CMI that RPM was the "same company" as NL and that they were changing the name because they wanted to change the tax treatment of their employees.   After CMI approved RPM as a correspondent, NL was shut down, became effectively insolvent, and allegedly could not repurchase the defective loans NL had sold to CMI.

It is not only these facts that substantiate CMI's claim against RPM, but the natural inferences which one can draw from the facts: that the owners of NL set up a separate company in late 2007 as the mortgage industry was undergoing a downturn and gradually shifted the assets to that second company in order to evade the liabilities of the first company – many of which

would have come in the form of repurchase requests from companies like CMI regarding defective loans. But CMI need not *prove* that this was the case at this stage. CMI's allegations and the natural inferences that can be drawn from those allegations are sufficient to withstand RPM's motion to dismiss. The Complaint provides RPM with notice of CMI's claims against it, and CMI is entitled to discovery to further develop these claims so that it may ultimately prove them at trial.

**I.      CMI's Complaint Sufficiently Alleges that RPM Was the Alter Ego of RPM.**

Under Missouri law, "ordinarily two separate corporations are to be regarded as wholly distinct legal entities, even though the stock of one is owned partly or entirely by the other." Liberty Financial Mgmt. Corp. v. Beneficial Data Processing Corp., 670 S.W.2d 40, 52 (Mo. App. 1984). "Of course, the existence of a corporate entity may be ignored when it is created or used for an improper purpose." Id. "The question is whether the corporations are being manipulated through their interrelationship to cause illegality, fraud, or injustice. If they are, the corporate veil will be disregarded to provide relief." Id. (quoting Camelot Carpets, Ltd. v. Metro Distributing Co., 607 S.W.2d 746, 750 (Mo. App. 1980)). In other words, "when the … arrangements between the two corporations is devised or used to accomplish a fraud, injustice, or some unlawful purpose, then the separate formal corporate structures will be ignored." Real Estate Investors Four, Inc. v. American Design Group, Inc., 46 S.W.3d 51, 56 (Mo. App. 2001); Terre du Lac Ass'n, Inc. v. Terre Du Lac, Inc., 737 S.W.2d 206, 218 (Mo. App. 1987) ("the evidence must establish that the corporate cloak was used as a subterfuge to defeat public convenience, to justify a wrong, or perpetrate a fraud").

To pierce the corporate veil and hold one corporation liable for the acts of another corporation under Missouri law, a plaintiff must show:

(1)     Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and

(2)     Such control must have been used by the corporation to commit fraud *or* wrong, to perpetrate the violation of statutory or *other positive legal duty*, or dishonest and *unjust* act in contravention of plaintiff's legal rights; and

(3)     The control and breach of duty must proximately cause the injury or unjust loss complained of.

Real Estate Investors Four, 46 S.W.3d at 56 (italics in original) (citing 66, Inc. v. Crestwood

Commons Redevelopment Corp., 998 S.W.2d 32, 40 (Mo. 1999)).

CMI's Complaint alleges facts which support each of these three factors.  First, CMI alleges throughout its Complaint that Robert and Tracey Hirt were the owners of both NL and RPM, and that the Hirts has total domination and control over both entities (Compl. ¶¶ 21-24). Second, CMI alleged that this control was exercised so that NL could avoid its liabilities to creditors like CMI by forming RPM so the principals could continue in the same line of business without having to make good on its obligations (Compl. ¶¶ 27-29, 32, 59-60).  Finally, CMI alleged that the Hirts manipulated the interrelationship between NL and RPM in order to escape responsibility under the NL Agreement, proximately causing CMI's injuries since NL and RPM refused to repurchase the loans at issue in this case (Compl. ¶¶ 47-56, 58-61).  See Real Estate Investors Four, 46 S.W.3d at 58-59 ("when the action of the dominant corporation renders the subservient corporation insolvent, the requisite injury and causal connection is established").

Missouri case law has further developed the first prong of this test by creating eleven additional factors which assist courts in evaluating the degree of control the dominant corporation holds over the subordinate corporation:

(1)     The parent corporation owns all or most of the capital stock of the subsidiary.

6

(2)     The parent and subsidiary corporations have common directors and officers.

(3)     The parent corporation finances the subsidiary.

(4)     The parent corporation subscribes to all of the capital stock of the subsidiary or otherwise causes its incorporation.

(5)     The subsidiary has grossly inadequate capital.

(6)     The parent corporation pays the salaries and other expenses or losses of the subsidiary.

(7)     The subsidiary has substantially no business except with the parent corporation or no assets except those conveyed to it by the parent corporation.

(8)     In the papers of the parent corporation or in the statements of its officers, the subsidiary is described as a department or division of the parent corporation, or its business or financial responsibility is referred to as the parent corporation's own.

(9)     The parent corporation uses the property of the subsidiary as its own.

(10)    The directors or executives of the subsidiary do not act independently in the interest of the subsidiary but take their orders from the parent corporation in the latter's interest.

(11)    The formal legal requirements of the subsidiary are not observed.

Real Estate Investors Four, 46 S.W.3d at 56-57 (citing Collet v. American Nat. Stores, Inc., 708 S.W.2d 273, 284 (Mo. App. 1986).  Of course, Collet was able to analyze these factors in the wake of a two-stage bench trial.  Collet, 708 S.W.2d at 275.  The Real Estate Investors Four decision also came following a bench trial.  Id. at 53.  CMI does not need to establish these facts by clear and convincing evidence at this stage, nor does it even need to show that it is probable that RPM is subject to alter ego liability.  Instead, CMI's simply had to plead its complaint to state a claim for relief that is plausible on its face, even if proof may be improbable or recovery remote and unlikely.  See Braden, 588 F.3d at 594.  It has done so.

And even on the basis of what information it has been able to discover, CMI has alleged the basis for determining many of these factors.  Factors 1 through 4 are alleged in paragraphs 21-26 of the Complaint.  Factor 10 is alleged throughout the Complaint, in at least paragraphs 24, 27-30, and 32.  Factors 5 and 7 are alluded to in paragraph 30 of the Complaint.  In short, CMI has more than adequately placed RPM on notice of its claims against it in accordance with Fed. R. Civ. P. 8.  RPM's claim that it cannot defend against these allegations is absurd.

Missouri cases have long allowed even sparser allegations to proceed under the stricter fact pleading regime in Missouri's state courts.  In Terre du Lac, the plaintiff alleged that the principal acquired a controlling portion of outstanding stock, directly or indirectly controlled and influenced the activities of all the defendants and that the principal was held out to the plaintiff and the public as the controlling force.  Terre du Lac, 737 S.W.2d at 218.  The Court found these allegations were sufficient to establish the control prong of the alter ego test.  CMI has pleaded many more specifics than Terre du Lac and easily meets the lower pleading burden of Rule 8.

Likewise, in Zipper v. Health Midwest, 978 S.W.2d 398 (Mo. App. 1998), the court held that piercing the veil was appropriate.  The plaintiff, Dr. Zipper, presented evidence that one medical center entity, MCP, was a wholly-owned subsidiary of another, MCI, and that one of the principals represented to Dr. Zipper that MCI could cause MCP to sell him the medical building at issue.  Id. at 413.  In this case, RPM told CMI that it was "the same company" as NL in order to gain approval as a correspondent, and that it was only changing the name because of tax accounting purposes (Compl. ¶¶ 28-29).

## II.    RPM's Case Law is Distinguishable.

None of the cases RPM cites gives it the support it seeks.  Contrary to the tenor of RPM's argument, it is not CMI's burden to prove alter ego liability at this stage, only to present "a short

and plain statement of the claim showing [CMI] is entitled to relief." Fed. R. Civ. P. 8(a)(2). RPM has taken twelve allegations of CMI's Complaint and analyzed each of them individually to argue that CMI has failed to meet its pleading burden. This ignores the inferences that can be drawn from the facts taken together, as demonstrated above. The Complaint clearly delivers a short and plain statement of CMI's claim against RPM.

In Greater Kansas City Laborers Pension Fund v. Superior General Contractors, Inc., 104 F.3d 1050 (8th Cir. 1997), after a bench trial, the Eighth Circuit declined to find alter ego liability because the district court found that "control and management" of the two companies was "separate and distinct." Id. at 1055. CMI has alleged that the control and management of NL and RPM was anything but "separate and distinct."

In In re Genetically Modified Rice Litig., 576 F. Supp.2d 1063, 1073-74 (E.D. Mo. 2008), Judge Perry noted that the alter ego test is a "flexible one" in the context of determining whether jurisdiction was proper over the parent German corporation of other defendant corporations, not whether alter ego liability was proper in the context of one corporation continuing the business of another while evading the predecessor's liabilities.

In Gannon Joint Venture Ltd. Partnership v. Masonite Corp., 2008 WL 2074110 (E.D. Mo. May 14, 2008), Judge Hamilton granted a motion to dismiss as to one defendant on a tort claim finding that the plaintiffs failed to allege sufficient level of control over the tortfeasor, but gave leave to plaintiffs to file a second amended complaint curing this deficiency. Id. at *4. This case does not involve a tort, and CMI has alleged the requisite level of control over both NL and RPM by Mr. and Mrs. Hirt.

RPM also argues that inadequate capitalization must be measured at the time of incorporation and that NL was adequately capitalized at its incorporation but this misstates the

case law.  See 66, Inc, 998 S.W.2d at 41 ("*generally*, the adequacy of capitalization is measured at the time of incorporation") (emphasis added).  In reality, "adequacy of capitalization is a *fact question* that turns on the nature of the business of the particular corporation."  Id. (emphasis added).  In 66, Inc., the "uncapitalized shell corporation was used to avoid debts arising out of the condemnation proceeding."  Id.  In this case, CMI alleges that RPM is being used to avoid debts arising out of NL's prior agreements, including its agreement with CMI (Compl. ¶¶ 59).  But discovery may explain further how this scheme was achieved – as of now, CMI has met its burden to put RPM on notice of the claim against it.

In Mobius Mgmt. Systems, Inc. v. West Physician Search, LLC, 175 S.W.3d 186 (Mo. App. 2005), the court found that a landlord could pierce the corporate veil of a physician's office to reach the physician himself since he commingled personal funds with the corporation, failed to maintain separate books or records, and failed to follow corporate formalities.  Id. at 187.  The case did not discuss alter ego liability between two companies.

Similar fact patterns to this case arose in Osgood v. Midwest Parking Solutions, 2009 WL 4825192 (E.D. Mo. Dec. 11, 2009) (finding plaintiffs' allegations of the individual's control and dominance of the corporate entity sufficient to survive a motion to dismiss) and in Maganallez v. Hilltop Lending Corp., 505 F. Supp.2d 594 (N.D. Cal. 2007) (denying motion to dismiss alter ego claim against individual who controlled corporate defendant).  Indeed, in Maganallez, the court noted that an allegation "that one of the major shareholders has 'essentially full operational control' over [the defendant] during a specific period was sufficient to justify allowing plaintiffs to proceed on an alter ego theory."  Id. at 608 (citing In re Napster, Inc. Copyright Litig., 354 F. Supp.2d 1113, 1122 (N.D. Cal. 2005)).  Maganallez also cited Oregon Laborers-Employers Health & Welfare Trust Fund v. All State Industrial, Marine Cleaning, Inc., 850 F. Supp. 905 (D.

Or. 1994), where the plaintiffs alleged "that Allstate and another defendant shared the same corporate offices, used the same employees, performed the same type of work, and interchanged vehicles, real property and assets." This was sufficient to state a claim for alter ego liability, as CMI's allegations are here.

It is precisely these types of facts which make the alter ego determination so highly fact-specific. CMI has little ability to discover the ins and outs of NL and RPM's business at this stage of the case. Discovery will allow CMI to further develop its case as to RPM, and allow the Court to determine with all the facts present whether RPM is liable for NL's obligations. Dismissing the case now would only reward RPM and NL for their fraudulent activity.

**III.    CMI's Allegations Are Sufficient; RPM's Motion for More Definite Statement Should Be Denied.**

In the alternative to its motion to dismiss, RPM has moved under Fed. R. Civ. P. 12(e) for a more definite statement. Such a motion is proper when "a party is unable to determine issues he must meet, or where there is a major ambiguity or omission in the complaint that renders it unanswerable." Tinder v. Lewis County Nursing Home Dist., 207 F. Supp.2d 951, 959 (E.D. Mo. 2001). "In light of the liberal notice pleading standard of Rule 8 of the Federal Rules of Civil Procedure and the liberal discovery available to both sides, motions for a more definite statement are rarely granted." NEXTEP, LLC v. Kaba Benzing America, Inc., 2007 WL 4218977, *2 (E.D. Mo. Nov. 29, 2007); Tinder, 207 F. Supp.2d at 959 ("motions for a more definite statement are universally disfavored"). "Rule 12(e) provides a remedy for unintelligible pleadings; it is not intended to correct a claimed lack of detail." Id.

As demonstrated above, CMI's Complaint gives RPM adequate notice of its claims against it. RPM's co-defendant, NL, had no trouble preparing an answer to the Complaint (see ECF Doc. 19). The Complaint is not "unintelligible" and indeed RPM was able to pull the key

facts together in its motion to dismiss (see RPM Mem. at 3-4).  Just like its motion to dismiss, RPM's Motion for More Definite Statement should be denied.

## CONCLUSION

CMI respectfully requests that the Court deny RPM's Motion to Dismiss, or in the alternative, grant CMI leave to file an Amended Complaint which addresses any deficiencies the Court may identify in the Complaint as to RPM.

Dated: March 29, 2010                          **BRYAN CAVE LLP**

By:    /s/ James M. Weiss
            Louis F. Bonacorsi, #2668
            lfbonacorsi@bryancave.com
            James M. Weiss, #516553
            james.weiss@bryancave.com
            211 North Broadway, Suite 3600
            St. Louis, MO 63102
            (314) 259-2000
            (314) 259-2020 (facsimile)

Attorneys for Plaintiff CitiMortgage, Inc.

## CERTIFICATE OF SERVICE

I certify that on the 29th day of March, 2010,  the foregoing was filed with the Court's CM/ECF system for service upon the following counsel of record:

Evan Z. Reid
Lewis, Rice & Fingersh, L.C.
600 Washington Avenue, Suite 2500
St. Louis, Missouri 63101

Attorney for defendant RPM Mortgage, Inc.

Nathan E. Ross
Green Jacobson, P.C.
7733 Forsyth Boulevard, Suite 700
Clayton, Missouri 63105

Attorney for defendant NL, Inc.


                                        /s/ James M. Weiss
                              _____